# United States Court of Appeals
## For the First Circuit

---

No. 99-1888

AVIATORS FOR SAFE AND FAIRER REGULATION, INC.,

Petitioner,

v.

FEDERAL AVIATION ADMINISTRATION,

Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER OF

THE FEDERAL AVIATION ADMINISTRATION

---

Before

Selya, Boudin and Lynch,

Circuit Judges.

---

John M. Edwards with whom John C. Blessington and Kirkpatrick & Lockhart LLP were on brief for petitioner.
Charles W. Scarborough, Appellate Staff, Civil Division, Department of Justice, with whom David W. Ogden, Acting Assistant Attorney General, and Robert S. Greenspan, Appellate Staff, Civil Division, Department of Justice, were on brief for respondent.

---

July 25, 2000

---

BOUDIN, Circuit Judge. Petitioner, Aviators for Safe and Fairer Regulation, Inc. ("Aviators"), is a trade association of about fifty on-demand air charter companies. It brings this case to challenge a so-called notice of enforcement policy issued by the Federal Aviation Administration ("FAA") that purports to interpret, and to express its intent to enforce, a preexisting regulation governing how much rest pilots or other flight crewmembers must get between flight assignments.

Air charter companies furnish "air taxi" service to customers on demand rather than on a scheduled basis. The FAA regulates such companies under Part 135 of its regulations, 14 C.F.R. pt. 135 (2000). The regulation at issue in this case, id. § 135.267(d), was adopted in its current form in October 1985 and aims to ensure that pilots have adequate rest for purposes of air safety, see 49 U.S.C. §§ 40101(d), 44701(a)(4)-(5) (1994 & Supp. II 1996). It states, in relevant part, that each flight assignment to unscheduled one- and two-pilot crews "must provide for at least 10 consecutive hours of rest during the 24-hour period that precedes the planned completion time of the assignment." 14 C.F.R. § 135.267(d).

The term "rest" is not defined in the regulation. On several occasions, the FAA sought to refine the term through

-3-

rulemaking but those efforts were abortive.[1]  Then, on June 15,

1999, without prior notice or rulemaking proceedings, the FAA

issued a "notice of enforcement policy."  The notice said that

it was merely reiterating the FAA's "longstanding interpretation

of its regulations" concerning rest requirements and continued

in pertinent part:

> [T]he FAA has consistently interpreted the term rest to mean that a flight crewmember is free from actual work from the air carrier or from present responsibility for work should the occasion arise.  Thus the FAA previously has determined that a flight crewmember on reserve was not at rest if the flight crewmember had a present responsibility for work in that the flight crewmember had to be available for the carrier to notify of a flight assignment.

Notice of Enforcement Policy, 64 Fed. Reg. 32176, 32176 (1999).

The principal controversy centers upon how (and in one case

whether) the notice resolves two different scenarios, which we

shall refer to as the duty-to-report and the duty-to-be-

available.

---

[1] See, e.g., Notice of Proposed Rulemaking, 60 Fed. Reg. 65951, 65959-61, 65976 (1995); Notice of New Task Assignment for the Aviation Rulemaking Advisory Committee (ARAC), 63 Fed. Reg. 37167, 37167 (1998).  The term "rest," again without definition, is used in several other regulations establishing flight crew rest requirements for larger and scheduled carriers, see 14 C.F.R. §§ 121.471(b), 135.265(b) (2000) (9 to 11 continuous hours in the 24-hour period preceding completion of a flight assignment); id. §§ 121.471(d), 135.265(d) (one uninterrupted 24-hour period weekly); the term appears to be used interchangeably among these regulations.

In the duty-to-report scenario, a crewmember who is nominally off duty has a responsibility during the period to leave a contact number, to be fit to fly, to take any telephone calls or other communications notifying him of a flight assignment, and to report for that assignment in a reasonable time (e.g., two hours). In the duty-to-be-available scenario, the same is true but the crewmember has the option to accept or decline a flight assignment that is offered during this off-duty period. It is easy to see why such arrangements would be attractive to an air taxi carrier.

Under either scenario, a call to the crewmember followed by an accepted assignment would (at some stage) terminate any "rest" that might otherwise be accruing. The crewmember, to be eligible for the assignment, would have to have met the "ten hours rest" quota based on "rest" that had already occurred. But the FAA's position in its notice as to the duty-to-report scenario (the duty-to-be-available scenario is a different issue) is that even if no call were made during this nominal off-duty period, none of the period would count as rest because the generic responsibility to leave a number, take calls, and report if assigned would negate "rest" for the entire period.

Aviators sought direct review of the notice under 49 U.S.C. § 46110 (1994), which permits any person "disclosing a substantial interest in an order issued by" the FAA with respect to aviation safety matters to seek review in an appropriate court of appeals, id. § 46110(a). The court of appeals has "exclusive jurisdiction to affirm, amend, modify or set aside any part of the order and it may order" the FAA to conduct further proceedings. Id. § 46110(c). We consider first threshold issues as to our authority to review the notice; then, Aviators' procedural claim that the notice required notice and comment rulemaking; and last, Aviators' substantive attacks on the FAA's position.

1. The FAA does not directly dispute that its notice of enforcement policy constitutes an "order," but raises the issue obliquely, saying that it is merely giving advance notice of an intention to enforce the law. Whether a notice thus limited would be reviewable is beside the point; here, the FAA's "notice" adopts a firm interpretation of an existing regulation. The term "order" is read expansively in review statutes generally, 5 U.S.C. § 551(6) (1994) (an "order" includes "the whole or a part of a final disposition, [including those] declaratory in form"), and this statute specifically, New York v. FAA, 712 F.2d 806, 808 (2d Cir. 1983); Northwest Airlines,

-6-

<u>Inc.</u> v. <u>Goldschmidt</u>, 645 F.2d 1309, 1313-14 (8th Cir. 1981). To that extent, the notice here qualifies as a reviewable "order," assuming other conditions (<u>e.g.</u>, finality, ripeness) are met.

Several circuits (although not this one) have said that there must be "an administrative record" for agency action to be a reviewable order under section 46110. <u>See</u>, <u>e.g.</u>, <u>Green</u> v. <u>Brantley</u>, 981 F.2d 514, 519 (11th Cir. 1993); <u>City of Alexandria</u> v. <u>Helms</u>, 728 F.2d 643, 646 (4th Cir. 1984). Yet almost all of these cases find that the requisite record need not be substantial so long as the agency's position is definitive and clearly expressed. <u>See</u> <u>San Diego Air Sports Ctr., Inc.</u> v. <u>FAA</u>, 887 F.2d 966, 969 (9th Cir. 1989) (a letter may suffice). In any event, an inadequate record is more likely to be a basis for setting aside final agency action than for refusing to review it. <u>See</u> <u>Citizens to Preserve Overton Park</u> v. <u>Volpe</u>, 401 U.S. 402, 419-20 (1971).

The FAA does not contest the notice's finality--and with good reason. The notice is unquestionably final in a procedural sense: it is not a <u>proposal</u> to interpret a regulation, and there is no indication that the FAA plans to conduct further proceedings on this declaration. <u>See</u> <u>Alexandria</u>, 728 F.2d at 646. Rather, the FAA's principal challenge to our review at this time--its request that review be

deferred until there is an actual enforcement proceeding in which objections might be raised in defense--is an argument properly considered under the rubric of ripeness. See Public Serv. Comm'n v. Patch, 167 F.3d 15, 23 (1st Cir. 1998).

An issue is ripe for judicial review if it is "fit" for immediate review and delay would impose "undue hardship" on litigants. Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967). As to hardship, the FAA's notice promised "enforcement" (after a 180-day grace period that has already expired, 64 Fed. Reg. 32176, 32176 (1999)), not opportunities for negotiations or further clarification, and enforcement may include penalties up to and including the revocation of charters, 14 C.F.R. § 13.19(b) (2000). Conversely, compliance may also require major changes in air taxi operations, and deferral of review would clearly threaten hardship. Cf. Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990).

With respect to fitness, the most common concern is whether a rule or order is framed in terms so general that only its application to specific facts (usually in an enforcement proceeding) would permit the court to make a reasoned judgment. Patch, 167 F.3d at 23. As to the duty-to-report scenario, we think that the FAA's position is plain enough from the language

of its notice,[2] especially when read in light of prior statements (discussed below), and involves a clear-cut pattern of conduct that may arise frequently in air taxi operations.  In this respect, the notice is well fit for review at this time.

The duty-to-be-available scenario is different.  Although Aviators has presented a distinct pattern of conduct likely to be important to air taxi operations, we find no similar clarity in the notice (see note 2, below), or earlier interpretive letters (see note 6, below), to show how the FAA would resolve the scenario.  True, one footnote in the FAA's brief, and its statements at oral argument, suggest that an unrequited duty-to-be-available is not "rest," but we are unwilling to bind the agency to the less-than-clear litigation position of its lawyers in deciding whether a controversy is fit for review.  Cf. Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212-13 (1988).

A final issue of "authority" which was not raised by the FAA--indeed, it commendably conceded the point at oral argument--deserves to be mentioned.  The review statute, 49

_____

[2]Pertinently, the FAA notice says that the crewmember must be "free . . . from present responsibility for work should the occasion arise."  64 Fed. Reg. 32176, 32176 (1999).  By contrast, in the duty-to-be-available scenario, it is much less clear that the crewmember has a "present responsibility for work" since the assignment can be declined.

U.S.C. § 46110 (1994), imposes a sixty-day time limit on petitions for review unless "there are reasonable grounds for not filing by the [sixtieth] day" after the order, id. § 46110(a). Here, the petition for review (filed August 6, 1999) is timely as to the notice of enforcement policy (issued June 15, 1999), but comes years after the order adopting the 1985 regulation at issue. Yet, as we will see, Aviators could be regarded in some respects as attacking the original regulation.

If so, this case arguably falls within the proviso of the statute permitting a later challenge where there are "reasonable grounds" for the delay.[3] Here, reasonable grounds probably exist for a deferred attack inasmuch as neither the original 1985 regulation nor accompanying commentary eliminated uncertainty as to how the FAA might resolve any of a number of scenarios (including the duty-to-report and the duty-to-be-available) that might arise in practice. Cf. Charter Township of Huron v. Richards, 997 F.2d 1168, 1172-73 (6th Cir. 1993); Greater Orlando Aviation Auth. v. FAA, 939 F.2d 954, 960 (11th Cir. 1991).

---

[3]The proviso is unusual (compare the Hobbs Act, 28 U.S.C. §§ 2341-51 (1994 & Supp. II 1996)), but reviewing courts have often read the Hobbs Act and like statutes as containing an implicit "good cause" exception, see American Gas Ass'n v. FERC, 912 F.2d 1496, 1514 (D.C. Cir. 1990); RCA Global Comms., Inc. v. FCC, 758 F.2d 722, 730 (D.C. Cir. 1985).

2.  As the parties have briefed the issue, the first question on the merits is procedural: whether the FAA was required to conduct notice and comment rulemaking before issuing its notice of enforcement policy. If the FAA were altering or enlarging obligations imposed by a preexisting regulation, notice and comment rulemaking would be required, see Warder v. Shalala, 149 F.3d 73, 80-81 (1st Cir. 1998), cert. denied, 67 U.S.L.W. 3470 (U.S. Apr. 19, 1999) (No. 98-1131), but a mere "interpretation" can ordinarily be done without rulemaking, id. at 80; see also 5 U.S.C. § 553(b)(B) (1994).  Whether "ordinarily" means "always" is an interesting question.  Cf. Dugan v. Ramsay, 727 F.2d 192, 196-98 (1st Cir. 1984) (rejecting agency "interpretation" without rulemaking); Jicarilla Apache Tribe v. FERC, 578 F.2d 289, 292-93 (10th Cir. 1978) (same).

To determine whether the FAA is altering or enlarging the 1985 regulation depends on the "meaning" of the original regulation (validity is a different question). See Warder, 149 F.3d at 80-81.  The 1985 regulation, as applied to the scenarios at issue, supplies no very clear answer because it does not define "rest" or otherwise indicate how the FAA would resolve the duty-to-report scenario. See 14 C.F.R. 135.267(d) (1986); 50 Fed. Reg. 29306, 29311-14, 29317 (1985).  Nor is help provided by a precursor regulation first codified in 1970 from

-11-

which the key 1985 language was borrowed.  See 14 C.F.R. § 135.136(b) (1970); 34 Fed. Reg. 1443, 1444 (1969).

Of course, subsequent administrative interpretation is often treated as evidencing, or substituting for, a supposed "original" intent.  See Mullins Coal Co. v. Director, 484 U.S. 135, 159-60 (1987).  And the gist of Aviators' claim is that despite  the open-textured quality of the 1985 regulation, it had been given meaning over time and had come to rest in a well-settled interpretation that is favorable to Aviators' cause, which the notice of enforcement policy mistakenly contradicts. A less extreme version is that at least the agency must give "reasons" why it is reversing an established position.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Citizens Awareness Network, Inc. v. Nuclear Regulatory Comm'n, 59 F.3d 284, 290 (1st Cir. 1995).

As to the duty-to-report scenario, it is clear to us that there is no "reversal":  the FAA has consistently maintained--in its interpretive letters, bulletins, and other statements--that an off-duty period encumbered by the threat of interruption from a mandatory assignment is not rest.  For example, Flight Standards Information Bulletin 92-02 (Jan. 24, 1992) states that "the FAA has consistently interpreted its "nest" requirement to be satisfied only if the rest time is:

determined prospectively . . . . A period of time during which a pilot has a present responsibility for work, if called, does not qualify as a rest period. This should be contrasted with a pilot who does not have a present responsibility to fly, when called."[4]

Admittedly, this position, whether in its most recent articulation in the notice, or in the FAA's previous explanations, is not as clear as it could be;[5] but it is clear enough. In fact, there are interpretative statements to the same effect <u>preceding</u> 1985. <u>See</u>, <u>e.g.</u>, Letter from A.W. Lalle, Acting Associate General Counsel, FAA, to John F. Nevins, Air Line Pilots Association (Feb. 5, 1968) ("[W]hen a flight

---

[4]<u>See also</u> Letter from Donald P. Byrne, Assistant Chief Counsel, FAA, to Frederick G. Pappas, Jr., Director, Flight Services, Midwest Corporate Aviation, Inc. (June 24, 1991) ("[A] rest period must be prospective in nature. Stated another way, a flight crewmember must be told in advance that he or she will be on a rest period for the duration required by the regulations. In addition, a rest period must be free of all restraint. However, the Agency's interpretations hold that receipt of one telephone call or beeper call does not constitute a violation of a rest period provision. Moreover, a flight crewmember in a rest period must be free of present responsibility for work should the occasion arise.").

[5]Interestingly, "rest period" is defined in section 135.273(a), a different section of the same subpart as the regulation at issue, added in 1994 to govern flight <u>attendants</u> in air charter operations. 14 C.F.R. § 135.273(a) (2000); 59 Fed. Reg. 42663, 42663 (1994). It is there defined as "the period free of all responsibility for work or duty should the occasion arise," the very language used in the 1999 notice.

crewmember is required by the air carrier to hold himself available to call, it constitutes a restraint which interrupts the 24-hour period, which we have held should be free from a loss of freedom or restraint."). More important, there is no evidence that the FAA has ever said that the duty-to-report scenario did count as rest. The 1992 FAA bulletin on which Aviators relies, which we have just quoted, actually hurts its "reversal" claim.

Nor are we troubled by Aviators' argument that the FAA's current position on the duty-to-report scenario is inconsistent with a decision by the Eighth Circuit. See United States v. Ozark Airlines, Inc., 506 F.2d 526 (8th Cir. 1974). That decision construed a weekly rest requirement regulation, 14 C.F.R. 121.471(d) (1970), and inferred from the use of "duty" in other subsections that rest "from all further duty" meant rest from "duty aloft." Ozark, 506 F.2d at 237. "Duty aloft" was changed to "flight time" in the 1985 version of this regulation to make clear that "duty," for purposes of the rest requirements, was a broader concept than "duty aloft." See 14. C.F.R. §§ 121.471(a)-(c) (1986).

By contrast, the FAA has been much less consistent as to the duty-to-be-available scenario. The relevant interpretive

letters appear not merely in tension, but at odds,[6] and on this point, the 1992 Bulletin is arguably helpful to Aviators.  See Flight Standards Information Bulletin 92-02 ("A period of time during which a pilot has a present responsibility for work, if called, does not qualify as a rest period.  This should be contrasted with a pilot who does not have a present responsibility to fly, when called.").  But, as earlier explained, we still do not know for sure how the FAA would resolve this latter scenario. 3.  This brings us to Aviators' substantive attacks, whether treated as attacks on the notice or on the regulation itself.  Here, the FAA starts with a substantial advantage:  the question how much rest flight crewmembers should be given to guard against pilot fatigue and what interruptions should count against satisfying the ten-hour rest requirement are technical issues involving safety where the agency's latitude is substantial.  See 49 U.S.C. § 40101(d),

---

[6]Compare Letter from Donald P. Byrne, Assistant Chief Counsel, FAA, to Frederick G. Pappas, Jr., Director, Flight Services, Midwest Corporate Aviation, Inc. (June 24, 1991) ("Does a pager check during a 24 hour standby period interrupt crew rest? . . . [S]tandy does not constitute crew rest.  The pager check does not interrupt crew rest because crew rest is not taking place."), with Letter from Donald P. Byrne, Assistant Chief Counsel, FAA, to B. Stephen Fortenberry, Evergreen International Airlines, Inc., (undated, in response to a letter dated October 12, 1989, with respect to section 121.471(d)) ("Is telephone standby in a hotel or at home 'duty'?  No, not in the sense that it produces the need for the rest period required by section 121.471(d).").

44701(a)(4)-(5) (1994 & Supp. II 1996); see also Bargmann v. Helms, 715 F.2d 638, 641-42 (D.C. Cir. 1983); Air Line Pilots Ass'n Int'l v. Quesada, 276 F.2d 892, 898 (2d Cir. 1960). And absent a mistake of law, the standard of review is whether the agency's actions are arbitrary or capricious, 5 U.S.C. § 706(2)(a) (1994), and whether any fact findings it made rest on substantial evidence, 49 U.S.C. § 46110(c) (1994).

Nevertheless, Aviators says that the FAA admits that a brief, unexpected phone call from the carrier does not disturb rest so as to require the ten-hour clock to be restarted. See, e.g., Letter from Donald P. Byrne, Assistant Chief Counsel, FAA, to Albert C. Pod, Vice President, Executive Jet Management (Apr. 19, 1991). The FAA verified at oral argument that it has not disclaimed that position, and indeed, the language of the 1999 notice --"if the flight crewmember . . . had to be available for the carrier to notify of a flight assignment"--arguably would not be triggered by an unanticipated phone call. Aviators says that, in light of this concession, it is irrational to deny the "rest" label in the duty-to-report scenario when no call in fact occurs.

We do not agree. The agency is perfectly entitled to regard a single unexpected phone call as less of a psychological interruption to pilot rest than the continuing burden that

-16-

exists in the duty-to-report scenario even when no call occurs. In the latter case, the pilot is effectively on a leash and knows that at any point (after ten hours) he may be summoned back to duty, for which he must remain "fit" to fly. Whether or not the FAA has drawn the line in the right place, the distinction drawn is not irrational.

Aviators' best claim is that there is no "explanation or evidence" in the record that excluding the duty-to-report time from "rest" is "necessary for, or even advances" safety. And, although the FAA has elsewhere referred to "scientific studies of fatigue," Notice of Proposed Rulemaking, 60 Fed. Reg. 65951, 65951 (1995), it points to no evidence or even a thoughtful discussion of the specific issue either in the notice or in the order adopting the 1985 regulation. Instead, the FAA's brief offers an explanation. To remove the taint of post hoc rationalization, see State Farm, 463 U.S. at 50; Natural Resources Defense Council v. EPA, 824 F.2d 1258, 1286 & n.19 (1st Cir. 1987), we note that the explanation is pretty obvious; the harder question is whether it is sufficient.

The FAA's commonsense explanation is this: given the purpose of the rest requirement to assure that the flight crew is refreshed and alert, anything that materially compromises a state of affairs conducive to rest threatens refreshment and

-17-

alertness; and a flight crewmember who is on call and subject to the various duties imposed by the duty-to-report scenario is less likely to be as refreshed and alert as one who need not worry that a demand to fly may come at any time. This is plausible enough; neither administrators nor judges are expected to ignore the known realities of human existence. See, e.g., Texas E. Prods. Pipeline Co. v. OSHA, 827 F.2d 46, 49 (7th Cir. 1987) (affirming agency's "common sense reading" that a "hole in the ground is, after all, a hole in the ground").

The force of this commonsense explanation is reinforced by the fact of its long standing--at least fifty years. In 1949, the acting general counsel of the Civil Aviation Administration was asked for an interpretation of then-existing "relief from all duty" requirements. Letter from Robert P. Boyle, Acting General Counsel, Civil Aviation Administration, to Coordinator, International Field Office, Lima, Peru (April 22, 1949). The inquiry presented the following scenario: "[An air carrier] schedules a 'stand by' crew which must remain at home subject to immediate call as replacement in case any of the originally scheduled crew are unable, because of sickness, etc., to take the trip out as scheduled. This 'stand by' crew, if not called as a replacement on that day, is then scheduled as a regular crew for a trip on the following day." Id.

-18-

In response, the acting general counsel ruled:

> This appears to be such a lack of freedom of restraint and release from duty as to prevent the full and free exercise of an opportunity to rest intended by the rest period provisions of the Civil Air Regulations. It is immaterial that the pilots are not required to report to the airport or actively engage in work for the air carrier during the period of the stand by schedule. The term "relief from duty" as used in the above-noted section means that the pilot must be relieved from either actual work for the air carrier or present responsibility for such should the occasion arise. A "stand by" schedule of the type described in the memorandum does not provide such relief from all duty with the air carrier.

Id.

Of course, without "evidence," we have no way of knowing just how much these stand-by duties do compromise rest. But agencies often make choices where no evidence can demonstrate a single right answer. Determining cut-off toxicity exposures in environmental regulation, see Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1504-05 (D.C. Cir. 1986), or rates of return in utility cases, see Borough of Ellwood City v. FERC, 731 F.2d 959, 974-75 (D.C. Cir. 1984), are good examples. Where, as here, the agency's choice appears to be within a zone of reasonableness, a court will normally defer. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951);

Consolidated Oil & Gas, Inc. v. FERC, 806 F.2d 275, 279 (D.C. Cir. 1986).

The more serious difficulty is the lack of an opportunity for Aviators or other opponents to offer such rebuttal commentary or evidence. But, of course, Aviators has not claimed to have medical studies or expert testimony to show that the restrictive reading serves little or no purpose: it says only that the FAA has failed to provide supporting evidence of its own. Perhaps Aviators can develop compelling physiological evidence or collect the testimony of affected pilots to show that duty-to-report time gives pilots as much "rest" as time at home with no overhanging responsibilities. If so, Aviators can file a petition tendering the evidence and asking the FAA to modify its regulation accordingly. 5 U.S.C. § 553(e) (1994).

This is a close case and we have given careful consideration as to whether a remand might be warranted. But the FAA's position on duty-to-report time is on its face plausible even without evidentiary support; this position has been consistent over time, even assuming that enforcement has been lax; and there is no indication from Aviators that it could supply useful evidence if we did order a remand. The FAA should not assume that the duty-to-be-available scenario--only a step

further down the road but a significant step since the crewmember could refuse the assignment--would automatically be sustainable on the same basis.

A somewhat different rationale for its narrow view of "rest" seems to be articulated in the FAA's brief in this court which might, if adopted by the agency itself, provide additional support for its position on the duty-to-report scenario and also apply equally to the duty-to-be-available scenario. The reasoning does not depend on the psychological burden of overhanging obligations but on the possible threat that recalling the flight crewmember to duty after the initial ten hours of rest could throw off the sleeping rhythms of pilots in an unacceptable way.[7] This concern, which the FAA itself may never have articulated, may or may not be substantial, and we express no opinion on the merits.

Last, Aviators says that the FAA's position is unreasonable and unfair because no corresponding rest requirements exist for fractional ownership programs, which

_____

[7]The example given by the FAA brief (slightly corrected) is of a pilot who goes off duty at midnight on Monday night, wakes on Tuesday at 6:30 a.m. and would normally go to sleep again at 11 p.m. If the pilot is subject to recall on two hours' notice after 10 a.m. on Tuesday, conceivably he could be called at 10 p.m. on Tuesday for a flight at 12:30 a.m. on Wednesday at which point he will have been awake for 18 hours already, unaware that sometime during that period he should have gotten some sleep.

-21-

allegedly compete with air taxi carriers but are governed by Part 91 of the FAA's regulations, 14 C.F.R. 91 (2000). This argument has not been well developed in this court; and there may be substantive differences in operations that justify the FAA's decision to regulate the two kinds of programs differently. But the FAA would have some explaining to do if the two sets of operations are pertinently the same, especially if there is a competitive relationship between them. Cf. Town of Norwood v. New England Power Co., 202 F.3d 392, 402-03 (1st Cir.), petition for cert. filed, 68 U.S.L.W. 3756 (U.S. May 30, 2000) (No. 99-1914).

However, agencies are not normally required to solve all similar problems at one time. See Mobil Oil Exploration v. United Distrib. Co., 498 U.S. 211, 231 (1991). The FAA is currently reviewing its regulation of those fractional ownership programs in separate proceedings. Aviators is free to argue its case in those proceedings, and if unsuccessful, it may seek review of that agency action under the same statute that enabled review in this case, 49 U.S.C. § 46110 (1994), or file a petition for rulemaking to modify the current regulation (14 C.F.R. § 135.267(d) (2000)) and spell out then the disparate impact claim in greater detail, 5 U.S.C. § 553(e) (1994).

-22-

Accordingly, we sustain the FAA as to the duty-to-report scenario and treat as unripe Aviators' claims regarding the duty-to-be-available scenario.  With respect to the latter, Aviators is free to seek a formal declaratory ruling from the FAA and to present its policy arguments and evidence to the agency.  See 5 U.S.C. § 554(e) (1994).  While the agency has discretion to refuse such a ruling, that refusal is reviewable for abuse of discretion, see Intercity Transp. Co. v. United States, 737 F.2d 103, 106-07 (D.C. Cir. 1984); cf. DeNovellis v. Shalala, 124 F.3d 298, 313 (1st Cir. 1997), and we think that a refusal to tell Aviators in advance whether the scenario constitutes "rest" would itself require a lot of explaining.

The petition for review is denied to the extent stated and otherwise dismissed as presenting an issue unripe for review at this time.

It is so ordered.